IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

FILED

December 17, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

JAMES C. WALLACE and wife,    )
SUE H. WALLACE,               )
                              )
        Plaintiffs/Appellants, ) Gibson Chancery No. 12357
                              )
VS.                           ) Appeal No. 02A01-9702-CH-00048
                              )
BOBBY J. HARDIN and wife,     )
FRANCES L. HARDIN,            )
                              )
        Defendants/Appellees.  )

APPEAL FROM THE CHANCERY COURT OF GIBSON COUNTY
AT TRENTON, TENNESSEE
THE HONORABLE GEORGE R. ELLIS, CHANCELLOR

FLOYD S. FLIPPIN
B. CHADWICK RICKMAN
ADAMS, RYAL & FLIPPIN, ATTORNEYS-P.C.
Humboldt, Tennessee
Attorneys for Appellants

BILLY C. BLOW
McLemoresville, Tennessee
Attorney for Appellees

AFFIRMED IN PART, REVERSED IN PART

ALAN E. HIGHERS, J.

CONCUR:

DAVID R. FARMER, J.

HOLLY KIRBY LILLARD, J.

In this action to reform a deed, Plaintiffs, James C. Wallace and Sue H. Wallace

("Wallaces"), appeal the trial court's judgment ratifying, approving, and confirming the 1993 warranty deed ("deed") and granting Defendants Bobby J. Hardin and Frances L. Hardin ("Hardins") $1,000 in attorney fees.  Mr. and Mrs. Wallace also appeal the trial court's denial of their motion to alter judgment and/or for a new trial.  For reasons stated hereinafter, we affirm the trial court's judgment in part and reverse in part.

## FACTS

On November 12, 1995, the Wallaces filed a complaint to reform a deed in the Chancery Court of Gibson County, Tennessee, naming the Hardins as defendants. Thereafter, on December 29, 1995, the Hardins filed their answer and a counter complaint seeking ratification, approval, and confirmation of the deed, as well as damages and expenses.  The Wallaces filed their answer to the counter complaint on January 22, 1996. The trial court heard this matter on August 27, 1996, and rendered a decision in open court on August 28, 1996, ratifying, approving, and confirming the deed.  Additionally, the trial court taxed an attorney fee of $1,000 against the Wallaces.  This order was entered on September 26, 1996.  Subsequently, on October 21, 1996, the Wallaces filed a motion to alter the judgment of the trial court and/or a motion for a new trial.  The Hardins filed a response to these motions on October 25, 1996, which included a prayer for an additional attorney fee of $250 to be taxed to the Wallaces.  On December 4, 1996, the trial court heard oral arguments on these motions and rendered its decision in open court denying the Wallaces' motions and denying the Hardins' prayer for an additional $250 in attorney fees.  This order was entered on December 13, 1996.  The Wallaces filed their notice of appeal on January 3, 1997.

In 1993, the Hardins approached the Wallaces regarding whether the Wallaces would be interested in selling certain property to the Hardins commonly known as "Rogers Farm."  The Wallaces had purchased this farm in 1973 from Modeane Flowers ("Flowers") and Annie Clayton ("Clayton").  Later, the Wallaces indicated that they would be interested in selling the farm.  James Wallace ("Mr. Wallace") and Bobby Hardin ("Mr. Hardin") met

2

at the farm and performed a "walk around" whereby Mr. Hardin marked the boundary lines of the farm at the direction of Mr. Wallace. Although the Wallace's deed from Flowers and Clayton indicated the farm consisted of approximately 63 acres, Mr. Wallace informed Mr. Hardin that the actual acreage of the farm was approximately 51 to 53 acres. Mr. Wallace had learned that his farm encompassed less acreage than the Flowers and Clayton deed indicated when he had a survey conducted by Jack Jetton in 1981 ("Jetton survey"). The parties agreed to a purchase price of $35,000.

Mr. Hardin advised Mr. Wallace that he wanted to have the farm surveyed to which Mr. Wallace had no objection. Thereafter, the survey was performed by Mr. Hardin and his son, Steve Hardin under the supervision of Lyndell Daniel, who visited the farm twice. This survey depicted the farm as consisting of 52.84 acres.

The Wallaces first learned of a dispute regarding the farm more than a year after the sale. The Wallace's son went to the back side of the Wallace's homestead property, which borders the property sold to the Hardins, in order to "bushhog" this property. The Wallace's son discovered that the property had already been cut. Thereafter, Mr. Wallace called Mr. Hardin to thank him for "bushhogging" Mr. Wallace's property. Mr. Hardin indicated that the property in question belonged to him and not Mr. Wallace. This cause ensued.

The disputed boundary line is the western boundary line of the farm in question. Mr. Wallace testified that the boundary line ran due south from Steve Hardin's southeast corner along an old fence row, and that this was the boundary used in his "walk around" with Mr. Hardin to mark the western boundary of the farm being sold. Mr. Hardin opposed this testimony stating that Mr. Wallace and he used the ditch line to establish the boundary in question at the "walk around."

It was at the closing that the Wallaces first learned that the survey conducted by the Hardins indicated that the area of the farm was 52.84 acres. There is some dispute as to

3

whether the Wallaces were shown the plat of the Hardin survey at the closing. The Wallaces contended that they were only provided with the description of the farm contained in the deed. The Hardins contended that the plat was provided to the Wallaces. It is undisputed that the description in the deed clearly mentions the ditch as the western boundary. However, the Wallaces asserted that they did not understand the description and signed the deed because the derivative clause indicated that the farm being conveyed was the same farm purchased from Flowers and Clayton in 1973.

The Wallaces called five witnesses all of which testified that the Wallace to Hardin deed did not contain an accurate description of the farm originally sold to the Wallaces by Flowers and Clayton. All five witness testified that they were familiar with the boundary in question and that this western boundary followed the old fence line and not the ditch line as the Hardins contended. Additionally, four of these witnesses asserted they saw the markings that Mr. Wallace and Mr. Hardin had placed on their "walk around" on the eastern boundary but found no such markings on the western boundary of the farm. None of these witnesses was privy to the negotiations nor present at the "walk around" with Mr. Wallace and Mr. Hardin.

The Wallaces called Tony Reasons ("Reasons"), a civil engineer and surveyor, who had plotted both the Jetton survey of 1981 and the survey prepared by the Hardins. Reasons testified that the property involved in both surveys was different, and that the Hardin's survey did not close within an acceptable degree of surveying accuracy. Reasons, however, did not survey or inspect the farm. Lyndell Daniel testified that he is a surveyor for the Tennessee Department of Transportation and has surveyed over 200,000 pieces of property. He disagreed with Reasons testimony that the survey did not close within an acceptable degree of accuracy and asserted that considering the many crooks, turns, and angles, it was not surprising that the survey failed to close.

The last witness called by the Wallaces was Linda Tilley ("Tilley"), the Chief Deputy of the Gibson County Assessor of Property. Ms. Tilley testified that the deed from the

4

Wallaces to the Hardins contained a different description of the farm than was recognized by the Flowers and Clayton deed to the Wallaces. Tilley was not present at the negotiations between Mr. Wallace and Mr. Hardin.

Based on the foregoing evidence, the trial court found that the Wallaces failed to carry their burden of proof in establishing a need for reformation of the deed in question. The trial court ratified, approved, and confirmed the deed from the Wallaces to the Hardins and awarded the Hardins $1,000 in attorney fees. This appeal followed.

**DISCUSSION**

Inasmuch as this case was tried by the court below sitting without a jury, this court's review on appeal is governed by Tennessee Rule of Appellate Procedure 13(d), which directs us to review the case *de novo*. *Roberts v. Robertson County Bd. of Educ.*, 692 S.W. 2d 863, 865 (Tenn. Ct. App. 1985); *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 300 (Tenn. Ct. App. 1984); T.R.A.P. 13(d). In conducting a *de novo* review of the record below, however, this court must presume that the trial court's findings of fact are correct. Under this standard of review, we must affirm the trial court's decision unless the trial court committed an error of law affecting the result or unless the evidence preponderates against the trial court's findings. *Roberts*, 692 S.W.2d at 865. In this regard, when a conflict in testimony requires the trial court to make a determination regarding the credibility of a witness or witnesses, such a determination is "binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary." *Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983).

This is an action to reform a deed. A court of chancery has the power to reform and correct errors in deeds produced by fraud or mistake. *Barnes v. Gregory*, 38 Tenn. (1 Head) 230 (1858). A court of equity has the power to reform a deed if the parties in interest are before the court and have an opportunity to be heard, and the case is made out by full and satisfactory proof. *McClelland v. Payne*, 84 Tenn. 709, 712 (1886). To be

5

the subject of correction, a mistake in an instrument must have been mutual or there must have been a mistake of one party influenced by the fraud of the other. *Pittsburg Lumber Co. v. Shell*, 189 S.W. 879 (1916).

A mutual mistake is one common to both parties to a contract, each laboring under the same misconception; more precisely, it is one common to all the parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement. 17 C.J.S. Contracts § 144 (1963).

This is not a case involving mutual mistake. The Wallaces and the Hardins were not laboring under the same misconception. On the contrary, the Hardins believed that the farm included the acreage bounded by the ditch line while the Wallaces maintained the farm encompassed the acreage bounded by the old fence row. These misconceptions are diametrically opposed. The Wallaces' basic contention in this case is that the description in the Wallace to Hardin deed was for more property than the Wallaces intended to convey. The Wallaces contend that there was a mistake made due to the incorrect survey measurements of Mr. Hardin. However, the Hardins insist that the deed was correct. The Hardins further assert that the deed is representative of the boundaries established via the negotiations and "walk around" by Mr. Wallace and Mr. Hardin.

The description in the deed came from the survey prepared by Mr. Hardin and Lyndell Daniel. The central dispute is whether the conveyance on the southwest side should follow a ditch or an old fence row. It is undisputed that Mr. Wallace and Mr. Hardin performed a "walk around" wherein Mr. Wallace directed Mr. Hardin where to mark the boundaries of the farm. Mr. Hardin had no knowledge concerning the farm or the boundaries prior to the "walk around." Just where these boundaries were marked on the western boundary on this "walk around" is the point at which the testimonies of Mr. Wallace and Mr. Hardin run converse to one another. Mr. Wallace testified that when Mr. Hardin and he reached the south end of the farm, the two walked up an old fence row and marked

6

the trees along the way. Mr. Hardin, on the other hand, testified that when the two reached the south end, they walked up a ditch to establish the western boundary.

Without question, the description in the deed clearly mentions the ditch. The deed provides, "thence, with center line of ditch and Wallace homeplace line . . . to a iron pin in Stephen Hardin's fenced property line; . . ." The Wallaces testified that they did not understand the description and, as a result, relied on the last paragraph in the deed stating that the farm to be sold was the farm the Wallaces had obtained from Flowers and Clayton. It seems that Mr. Hardin had no knowledge that the farm obtained by the Wallaces from Flowers and Clayton was any different from the description in the deed. As mentioned above, Mr. Hardin had no knowledge of the boundaries of the farm prior to their establishment during the "walk around." Further, he testified that he first acquired knowledge of the boundaries of this farm when Mr. Wallace directed him to place the boundary markings on the ditch line and not on an old fence row during the "walk around." Therefore, according to the Mr. Hardin's testimony, the derivative clause in the deed containing reference to the Flowers and Clayton farm and what was in the metes and bounds description within the deed were one and the same.

To authorize a reformation for mistake, the evidence must be clear and conclusive, *Davidson v. Greer*, 35 Tenn. (3 Sneed) 384 (1855); clear, certain, and satisfactory, *Bailey v. Bailey*, 27 Tenn. (Humph) 230 (1847); clear, convincing, and satisfactory, *Jones v. Jones*, 150 Tenn. 554 (1925); clear, cogent, and convincing, *Whitaker v. Moore*, 14 Tenn. App. 204 (1938); full, clear, and unequivocal, *Perry v. Pearson*, 20 Tenn. (1 Humph) 431 (1839).

Many witnesses testified on the Wallaces' behalf. Five of these witnesses testified that the western boundary followed an old fence line. Four testified that there were no markings on the western boundary of the property. However, not one of these witnesses was present during the "walk around" with Mr. Wallace and Mr. Hardin and none was privy to the negotiations. As a result, ultimately, the trial court was faced with one man's word

7

versus that of another--Mr. Wallace's testimony concerning the negotiations and "walk around" versus that of Mr. Hardin. After hearing the evidence, the trial court concluded that the Wallaces had not carried their burden to prove mutual mistake by clear and convincing evidence. We agree.

The evidence in this record does not evince a mutual mistake between the parties and, thereby, does not qualify by the foregoing standards. Therefore, the deed cannot be reformed on this basis. The evidence does not preponderate against the findings of the trial court. We affirm the judgment of the trial court finding no mutual mistake and ratifying, approving, and confirming the warranty deed given by the Wallaces to the Hardins.

Concerning the issue of mistake induced by fraud raised by the Wallaces on appeal, the Hardins contend that fraud was not pled at trial and, as a result, cannot be raised on appeal. Although fraud was not alleged in the Wallaces' pleadings, we find that evidence on this issue was entered at trial without objection. Additionally, the trial court ruled on this issue of fraud-induced mistake. Hence, this issue is appealable.

Tennessee Rule of Civil Procedure 15.02 provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Tenn. R. Civ. P. 15.02.

This rule itself abrogates the time factor by providing that "failure so to amend does not affect the result of the trial of these issues." *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1494 at 475 (1971). Moreover, Rule 15.02 does not require that a conforming amendment be made and there is no penalty for failing to do so. The rule clearly states that the absence of a formal amendment or a request for leave to amend does not affect the result of the trial of those issues actually litigated. *See also* Moore, Federal Practice, 15.13(2) at 168-170 ( noting that "[i]n effect . . . the parties may,

8

by express consent, or by the introduction of evidence without objection, amend the pleadings at will.").

Thus, it is clear that Rule 15.02 seeks to place substance over form, and the real question before us is whether or not the parties actually tried the issue delineated by the amendment. In short, the ultimate inquiry is whether there was implied consent from all parties in this case to try the issue of mistake induced by fraud.

Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should have reasonably known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby. Because of the proof problems at trial, the commentators warn that:

> Implied consent . . . is much more difficult to establish and seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial. A party who knowingly acquiesces in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform. Thus, consent generally is found when evidence is introduced without objection, or when the party opposing the motion to amend himself produced evidence bearing on the issue.

*Zack Cheek Builders v. McLeod*, 597 S.W.2d 888, 890-91 (Tenn. 1980)(quoting Charles Alan Wright and Arthur R. Miller, *supra*, § 1493 at 462-63).

We do not take lightly the Court's warning regarding the difficulty of finding implied consent. Substantial evidence bearing on the issue of mistake induced by fraud was introduced by the Wallaces' counsel. Mr. Wallace and Mr. Hardin testified that they extensively marked the western boundary of the farm in question. However, four witnesses testified that boundary markings were found on the eastern boundary of the farm but that no markings were found on the western boundary in dispute. One witness for the Wallaces only saw one marking on the western boundary. Counsel for the Wallaces highlighted this point in his closing remarks to the trial court claiming that Mr. Hardin had removed said markings from the western boundary of the farm.

9

In order to reform a deed, a court has to find mutual mistake or mistake induced by fraud. The Hardins knew that this was an action to reform a deed whereby mutual mistake or mistake induced by fraud had to be proven by the Wallaces in order to recover. In light of this fact, the Hardins reasonably should have known that the evidence of the five witnesses relating to boundary markings were aimed at proving fraud. They did not object to this evidence. Additionally, the trial court ruled on this matter, finding that the Wallaces had failed to carry their burden in proving mistake induced by fraud. Accordingly, Rule 15.02 of the Tennessee Rules of Civil Procedure causes the pleadings to conform to this evidence thereby allowing the issue of fraud to enter into this case and be appealed as if it were pled in the original complaint.

As mentioned above, mutual mistake or mistake induced by fraud must be proven by clear and convincing evidence. Although there was some evidence at trial pointing to fraud, there is still a lack of proof that the Wallaces had been induced by fraud to sign the deed. There has been no direct evidence other than the testimony of Mr. Wallace that the "walk around" did not include the ditch in question, and this evidence was sharply disputed by Mr. Hardin's testimony. The Wallaces could have and should have examined the description with more prudence before signing the deed. The evidence does not preponderate against the findings of the trial court on this matter. We affirm the judgment of the trial court finding no inducement of fraud by the Hardins and confirming the deed given by the Hardins to the Wallaces.

The final issue concerns attorney's fees. We adhere to the rule in Tennessee that attorney's fees are not recoverable in the absence of a statute or a contract specifically providing for such recovery. *Kultura, Inc. v. Southern Leasing Corp.*, 923 S.W.2d 536, 540 (Tenn. 1996)(citing *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)). In this case, we find neither. We hold that the trial court erred in awarding the Hardins $1,000 in attorney's fees and, therefore, reverse the judgment of the trial court concerning this matter.

10

**CONCLUSION**

Based on the foregoing, the judgment of the trial court is affirmed in part and reversed in part. Costs of appeal are assessed against appellants, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
FARMER, J.

_____
LILLARD, J.