FILED

09/20/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2018 Session

## LAURA COWAN COFFEY v. DAVID L. COFFEY ET AL.

Appeal from the Chancery Court for Knox County
No. 189999-2          Robert E. Lee Davies, Senior Judge
_____

No. E2017-00988-COA-R3-CV
_____

This case involves events that span a period of some twenty years following the death of Steven Lee Coffey in a plane crash on July 13, 1995. The deceased was a successful owner of a securities business. Plaintiff, Laura Cowan Coffey, is his widow. In the deceased's will, David L. Coffey (David the senior)[1], the deceased's father, was designated executor of his son's estate. Plaintiff alleges in her complaint for fraud, conversion, and breach of fiduciary duty, that David the senior breached his fiduciary duties and engaged in a fraudulent scheme to obtain for himself two highly-profitable assets of the estate, which ultimately sold for $45,000,000 in 2015 for the benefit of David the senior's heirs. Plaintiff also sued David Michael Coffey (David the younger) - who is the son of David the senior - in the former's capacity as trustee of the fortune resulting from the sale of the assets of the deceased. After a hearing on defendants' motions for summary judgment, the court granted their motions,[2] finding that the plaintiff's claims were barred by the applicable statute of limitations. Plaintiff appeals. We hold that plaintiff has set forth specific facts showing that there are genuine issues of material fact pertaining to fraudulent concealment of plaintiff's cause of action against the defendants rendering summary judgment inappropriate. Accordingly, we reverse the trial court's judgment granting the defendants' motions for summary judgment. This matter is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., AND JOHN W. MCCLARTY, J., joined.

_____

[1] This case involves two "Davids." To differentiate between them, we will refer to the father as "David the senior" and the other David as "David the younger."

[2] At an earlier time, a different chancellor in this case had denied the defendants' motions for summary judgment.

David T. Black and Carlos A. Yunsan, Maryville, Tennessee, and Thomas Stratton Scott, Jr., and Christopher Cain, Knoxville, Tennessee, and John A. Lucas, Knoxville, Tennessee, for the appellant, Laura Cowan Coffey.

W. Kyle Carpenter, O. E. Schow, IV, and Lindy D. Harris, Knoxville, Tennessee, for the appellee, David L. Coffey.

Jonathan D. Reed, Melissa B. Carrasco, and Allison S. Jackson, Knoxville, Tennessee, for the appellee, David Michael Coffee as Trustee of an Unidentified Trust or Trusts.

**OPINION**

**I.**

The deceased's primary non-liquid assets were the ownership and operation of two businesses, Securities Service Network, Inc. and Renaissance Capital, Inc. SSN was a successful company that employed an innovative processing system to manage the buying and selling of stocks for their customers. Renaissance owned assets that it leased to SSN. Within a week of the crash, David the senior told plaintiff that all of the deceased's files at SSN were missing. Plaintiff was unaware that David the younger had copied the files from the deceased's personal computer at SSN shortly after the deceased's death.[3] Nonetheless, David the senior managed to produce a letter, independent of the will, from among the deceased's files at SSN. The letter purports to be instructions provided by the deceased in the event of his death. The instructions directed that, upon his death, the two businesses were to be sold quickly before essential representatives left the companies. The instructions directed a sales price for SSN equal to thirty to thirty-five percent of the total annual revenue for the twelve months prior to the deceased's death.

Potential purchasers contacted David the senior expressing interest in purchasing SSN. The record indicates that David the senior discussed the sale with one individual in depth, a Patrick Pierce. In the course of his discussions with Mr. Pierce, David the senior discovered the growth and potential of SSN. By the end of August 1995, and after discussions with Mr. Pierce, David the senior decided that he would personally invest $500,000 in Mr. Pierce's plan and vision for SSN. Through November 1995, David the senior continued his discussions with Mr. Pierce. He later withdrew from the proposed agreement. David the senior told Mr. Pierce that plaintiff and Steve Maggart, plaintiff's

---

[3] Plaintiff first learned this fact twenty years later at David the younger's deposition. David the younger locked the floppy discs in a safe in Oak Ridge and did not produce them until his deposition in this lawsuit.

accountant, had instructed him to withdraw from the sales discussion.[4] This directive is contested by plaintiff. Plaintiff was never privy to the discussions David the senior had with Pierce or the information he obtained from those discussions.

On December 12, 1995, David the senior received a call inquiring whether SSN was for sale. He stated that it had been, but that it was no longer for sale. When plaintiff asked about the businesses, David the senior told her that there were no buyers. Plaintiff was not informed that a buyer was no longer being sought. Instead of seeking a buyer, David the senior decided that he was going to step in and run the businesses. To facilitate his control of SSN, David the senior asked plaintiff to go to SSN to advise the management and employees that he was now in charge. David the senior also asked plaintiff to resign from her position as secretary of the companies; she later resigned. Plaintiff did not object to David the senior managing the company, because she loved and trusted her father-in-law.

David the senior did not advise plaintiff of the success of the businesses. He represented to plaintiff that she had to sell the companies in order to have money on which to live. He told her that he could not make advances to her from the estate. Plaintiff asked David the senior for the deceased's income. David the senior told her that he could not provide that to her. Plaintiff instead borrowed money from her father.[5] He told her that she could not keep the company, because she was not properly registered and licensed. Notably, David the senior was also not registered or licensed.

To facilitate the administration of the estate and his purchase of the companies for himself from it, David the senior employed the services of attorney Christopher Hall. Plaintiff maintains that Mr. Hall, during the administration of the deceased's estate, engaged in multiple legal representations. He performed legal activities for David the senior, for the family trust, for SSN, and assisted plaintiff with processing her life insurance claim and prepared a will for her after her husband's death. Plaintiff alleges these representations created multiple loyalties and conflicts. Plaintiff consented to none of them. Mr. Hall produced a letter sent to plaintiff on October 16, 1995. The letter notified plaintiff that Mr. Hall only represented David the senior as the executor of the estate, that she should hire an attorney, and he provided her with the names of four

---

[4] Mr. Maggart's affidavit states that he was not plaintiff's advisor concerning the estate and that defendants' theory to that effect is misplaced. Mr. Maggart assisted plaintiff with her taxes and her personal financial planning. Mr. Maggart's affidavit clarifies that he was never an advisor to plaintiff in respect to valuation or estate matters, that he was never retained for those purposes, and that he never held himself out to be in such an advisory position.

[5] When she told David the senior that she did not want to sell the businesses, he got angry and told her she had to sell the business in order to have money to live on. The record indicates that SSN was accruing substantial profits at this time; the profits were kept in SSN and not disbursed to the estate.

attorneys. Plaintiff contests that she received such a letter. She maintains that she was never told in person about any actual or potential conflicts.

The will provided instructions for the creation of a family trust. Plaintiff complains that David the senior did not fund the family trust with the largest non-liquid asset of the estate - the SSN stock - as directed in the will. This is allegedly because he was going to sell the stock. Plaintiff states that by not placing the largest non-liquid asset of the estate into the trust, the deceased's estate plan was ignored by David the senior for his personal gain. David the senior claims that he was following the advice of Mr. Hall; Mr. Hall had prepared plaintiff and the deceased's estate plan. Instead of using the SSN stock, David the senior had plaintiff sign over the $500,000 insurance payment that was made to plaintiff outside of the estate, and he added $100,000 from the estate to form the trust. During David the senior's execution of his duties as a fiduciary, he failed to disburse the profits of SSN to the estate – a sum in excess of $750,000. The record suggests that David the senior ultimately purchased SSN for himself with the profits of SSN.

In the spring of 1996, David the senior advised plaintiff that he had sought buyers, but was unsuccessful. He told her that instead he had decided to pursue plans to purchase the companies for himself. To legitimize his purchase price, he obtained a valuation of SSN from Mercer Capital, he secured appointment of an administrator ad litem and a guardian ad litem, and he sought approval for the purchase from the court. Mercer Capital had done valuation work for David the senior prior to the valuation of SSN. Mr. Hall engaged Mercer Capital to do the valuation.

As of July 31, 1996, Mercer valued SSN at $1,557,200. Plaintiff argues that the valuation method used by Mercer directly conflicts with the instructions given by the deceased regarding the proper valuation method for purposes of sale. Plaintiff argues that, using the June 30, 1996 figures, which were not provided to plaintiff, the lowest value calculated by the deceased's prescribed method would be $5.55 million (30% of $18.5 million of revenue for the trailing twelve months). Additionally, the deceased had directed plaintiff to retain Renaissance as a source of income; she was not provided this option.

David the senior, through counsel, petitioned the court for appointment of an administrator ad litem for the estate, and a guardian ad litem to represent the interests of the minor children in his purchase of the companies. This is in contrast to the deceased's wishes, as expressed in his will. Naturally, the will had given plaintiff guardian status over her children. Furthermore, the will had directed that First Tennessee Bank National Association was to be the executor should David the senior fail to qualify or cease to serve. Nonetheless, on July 29, 1996, the court appointed attorney C. Paul Harrison as administrator ad litem of the estate for the purpose of documenting and negotiating the proposed sale of the stock of SSN and Renaissance by David the senior. The same day,

the court appointed attorney Edward A. Cox, Jr. as guardian ad litem for the minor children for the purpose of representing their interests, as beneficiaries of the Family Trust established under Section 3.1 of the will, with respect to the proposed sale of the stock of SSN and Renaissance to David the senior. David the senior brought plaintiff papers to sign so that he could have court approval to purchase the business himself. Plaintiff was not provided a copy. Plaintiff states that she was told by David the senior she would not need to go to court, and, at all times, she trusted her father-in-law in his representations to her regarding the estate.

In September 1996, David the senior purchased all of the stock in SSN and Renaissance for himself for $1,613,200. On September 3, 1996, the court entered an order approving the sale. On January 23, 1998, the administration of the estate concluded. The court entered an order to close the estate without detailed accounting. At David the senior's request, the estate documents were sealed by court order.

In 1996, plaintiff unsuccessfully sued a company involved in the crash that killed her husband. As of 2002, the Mercer valuation was within one of multiple boxes given to plaintiff at the end of the litigation. The boxes contained materials from the crash litigation, including a picture of the charred remains of her husband. Due to the explicit nature of the images, she promptly put the boxes in her attic without further review. Plaintiff maintains that she never retrieved nor reviewed the valuation contained therein until September 2014.

In 2006, David the senior met with plaintiff to tell her that she would not be in his and his wife's will. He told her that he was transferring the SSN stock to a trust for estate-planning purposes. David the senior told plaintiff that she would not be a beneficiary of the trust, but that her children would. He suggested plaintiff go work as a hostess for money, or move to South Carolina. No specific trust was mentioned. David the senior made no mention of the value of SSN to plaintiff. David the senior transferred the SSN stock to the Grantor Retained Annuity Trust, which had a five year term. When the GRAT expired in August 2011, the GRAT transferred most of the SSN stock to the Descendants Trust.[6] The Renaissance stock was transferred to the Descendant's Trust in 2012. David the younger was the trustee.

In January 2009, plaintiff reached out to David the younger and asked for a copy of the SSN valuation. David the younger sent her an email response purportedly with an attachment. The email contained a caveat that the attachment might not go through. Plaintiff disputes that she was sent the full valuation as the email attachment. The attachment has not been produced. She states that she was only sent a two page color

---

[6] Two percent of the stock was sold to four SSN employees. The beneficiaries of the Descendant's Trust are David the senior's two children, David the younger and Karen, and the deceased's two children, Clifton and Courtney.

copy of a valuation of SSN in the mail. The two-page valuation was shown to her son, Clifton Coffey, in 2010. Plaintiff no longer has that document, and contests receiving any other valuation documents allegedly sent to her by David the younger.

In or around 2010, Clifton graduated from Cornell University with a Master's in Business. He wanted to work for the business his father had founded. He asked David the senior, his grandfather, if he could work at SSN. David the senior told him that he could not offer him a position due to the appearance of nepotism. Plaintiff maintains that David the senior refused to allow Clifton to work at SSN because of fears that Clifton would uncover the fraud. Plaintiff states that as an executive employee or board member of SSN, he would most likely have had access to the historical financials of the companies, and he would have discovered the "egregious fraud that David [the senior] perpetrated on Laura Coffey, his mother."[7] Notably, David the senior's son, David the younger, was permitted access to the business and later the trustee of the resulting fortune.

On March 19, 2010, David the senior stated, in an email, that he sent plaintiff the Mercer valuation. That same day, she forwarded the email to Clifton, but she did not personally review any attached document. Plaintiff contests that the valuation was actually attached, and notes that the attachment to the email has not been produced. On March 21, 2010, David the senior emailed plaintiff a letter outlining how he had done her a favor by purchasing SSN at his own financial risk. He offered to have her meet with Mr. Hall for answers to her factual questions; plaintiff did not meet him because she found him unhelpful. On March 24, 2010, plaintiff forwarded the email to David the younger and his sister; David the younger responded by asking plaintiff if she needs him to do anything "with this." Plaintiff stated that she needed to meet. On March 31, 2010, plaintiff called David the younger to ask if David the senior did anything illegal or improper. David the younger affirmatively represented to plaintiff that nothing illegal or improper had been done.

Plaintiff then spoke with Tom Wall, her father's attorney, and he suggested she speak with an attorney in Nashville who might be able to answer her questions. She met with an attorney, Mr. Sweeney, and showed him the two-page valuation. Plaintiff maintains that he told her that he did not see anything that could be done. He merely confirmed that David the senior had paid for SSN what the two-page valuation said it was worth. On May 11, 2010, Mr. Sweeney sent her a non-engagement letter informing her that "there is always the possibility that a potential claim either is, or could at some time in the near future be, barred by the statute of limitations." He told her she could gather more information, but stated that he had not agreed to represent her and that he had not provided her with any legal advice.

---

[7] Ironically, Clifton was the individual to alert plaintiff to the fraud, in 2014, as a result of his reviewing the SSN sale records.

Plaintiff then requested information concerning her husband's estate from Mr. Hall. He sent her correspondence with enclosed documents; the documents that plaintiff actually received remains disputed. She sent Mr. Hall further correspondence requesting additional documents. He highlighted the difficulty of obtaining the information plaintiff sought, because he said the files were not easily available and he represented David the senior. In a letter dated August 2, 2010, Mr. Hall told plaintiff that, since her husband's death, David the senior and his wife had been "extraordinarily generous" to her by assisting her and her children with money. He affirmatively represented to plaintiff that David the senior "administered the Estate in a fair and reasonable manor (sic) in accordance with Tennessee laws governing fiduciaries and [David the senior] expended countless hours of work on behalf of the Estate at no charge." Mr. Hall told plaintiff that he and David the senior had worked hard to keep her advisor Mr. Maggart apprised of information and developments that he "thought [she] would want to know." Plaintiff and Mr. Maggart dispute that he was ever in any such advising capacity.

Plaintiff then spoke to David the younger. She states that he expressed anger at her due to the discomfort she was causing his father by inquiring into the transaction. David the younger told plaintiff that David the senior had done her a favor. She asked him if everything was done properly and legally surrounding the sale of the company. He told her "absolutely." Plaintiff made no further inquiries, because she was assured of the legality of all conduct surrounding the estate by David the senior, Mr. Hall, and David the younger.

Then, in 2014, plaintiff's son called her to inform her that there had been a substantial contract for the sale of SSN. Following her son's call, and at his insistence, she located a copy of the Mercer valuation and showed it to him. To locate the valuation, plaintiff unearthed boxes and trial exhibits from the lawsuit that had followed the tragic airplane crash. The boxes contain documents concerning the crash in which plaintiff's mother and husband burned to death. Plaintiff states that, due to the traumatic and horrifying nature of the contents of the boxes, she had put them away in her attic without review. Her son, who had become a financial professional on Wall Street, reviewed the documents and concluded there had been foul play. She went to the courthouse to get a copy of the probate file and was told it was "under seal."

Plaintiff states that she received the Mercer Capital valuation on September 27, 2014. She strongly disputes defendants' contention that she had the full valuation in 2010. She presented evidence that, during 2010, she was repeatedly assured of the legality of the purchase by the defendants. She maintains that defendants never provided her with the complete valuation, and that she did not see the complete valuation before 2014. The valuation was ultimately reviewed over the years by several professionals and the court; no one reported any misconduct. In 2015, the Descendant's Trust sold the SSN stock to Ladenburg Thalmann Financial Services Inc. for approximately $45,000,000. On July 17, 2015, following several months of investigation, this lawsuit was filed.

## II.

Plaintiff raises the following issues on appeal:

> Whether the court erred in granting summary judgment on plaintiff's claims based on the applicable statute of limitations.

> Whether the trial court erred in finding that the burden was on plaintiff to establish that the statute of limitations had been tolled.

> Whether the trial court erred in holding that plaintiff failed to state a claim to set aside its prior orders from 1996 and 1998 under the savings clause of Tenn. R. Civ. P. 60.02 for extrinsic fraud upon the court.

> Whether the court erred in granting summary judgment on plaintiff's claim for unjust enrichment based upon its finding that plaintiff failed to establish an essential element of her claim.

Defendant David the younger raises the following additional issue, as taken verbatim from his brief:

> Whether the Trial Court erred in awarding Plaintiff attorneys' fees solely because she was the prevailing party on Trustee's Motion for Sanctions Under Rule 11 even though the Trial Court found that it was appropriate and not frivolous for Trustee to file his Motion.

## III.

For the purposes of review on appeal of the motions for summary judgment, we view the facts in favor of the non-moving party plaintiff. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015).

We review a trial court's ruling on a motion for summary judgment *de novo*, without a presumption of correctness. *Id*. The moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Id*.

When a motion for summary judgment is properly supported, the nonmoving party, in order to survive summary judgment, may not rest upon the mere allegations or denials of its pleading but must respond, and by affidavits or one of the other means provided in Rule 56, set forth specific facts showing that there is a genuine issue for trial. *Id*. at 265. "The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id*. "[S]ummary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial." *Id*. (citing Tenn. R. Civ. P. 56.04, 56.06).

## IV.

### A.

As previously noted in this opinion, two chancellors have entered orders on defendants' summary judgment motions; the motions reached diametrically opposed results.[8] The first chancellor denied the motions for summary judgment filed by plaintiff and each defendant. The court stated in its order that "this case contains hundreds of allegations based upon an alleged 'complex scheme of fraud' and, therefore, this case is not a case that is appropriate to be disposed of at the summary judgment stage of litigation." On his own motion, the first chancellor subsequently recused himself. A second chancellor was assigned.

Defendant David the younger refiled his motion for summary judgment. The court renewed David the senior's motion as well, *sua sponte*, pursuant to Tenn. R. Civ. P. 54.02. After a hearing, the court granted summary judgment to the defendants. In its order entered April 20, 2017, the court stated that:

> Plaintiff has demonstrated a prima facie case of common-law fraud that: David L. Coffey, during 1996 affirmatively concealed his wrongful conduct of retaining the profits of SSN in the company; pressuring Plaintiff to sell the company; failing to diligently search for a willing, able and ready buyer;

---

[8] Plaintiff argues that summary judgment is inappropriate as the facts of this case are disputed and are clearly not facts that would permit a reasonable person to reach only one conclusion. This, she argues, is supported by the fact that two chancellors have, in fact, reached different conclusions.

failing to disclose his deceased son's formula for value to Mercer Capital; and using the company's profits for his purchase of the business rather than turning them over to the Estate. As the personal representative of the Estate, David L. Coffey had a fiduciary duty to Plaintiff and his grandchildren which he breached because of his desire to purchase SSN for his own benefit. Finally, David L. Coffey used the Court to conceal material information from the Plaintiff by having the file sealed upon the closing of the Estate in 1998.

\* \* \*

the initial tort would have accrued when David L. Coffey, with the Court's approval, purchased SSN from the Estate in September 1996. Pursuant to the discovery rule, Plaintiff had no actual knowledge that she had been wronged by David L. Coffey or had actual knowledge of facts sufficient to put her [on] inquiry notice that she had been wronged until many years later.

The "linchpin" of the alleged fraud in this case centers around the Mercer Capital appraisal. It is through that appraisal that Plaintiff contends David L. Coffey undervalued SSN, and her multiple requests for that appraisal underscore the significance of that document to her claim for fraud.

The court then turned to defendants' affirmative defense that plaintiff's claim for fraud is barred by the three year statute of limitations set forth in Tenn. Code Ann. § 28-3-105 (2017). It held that:

[w]hatever fraudulent concealment by David L. Coffey which tolled the running of the statute of limitations, ended in 2010 due to the affirmative actions of David L. Coffey in responding to each of the Plaintiff's requests for information and by the conduct of Plaintiff. Specifically, by June 2010, Plaintiff discovered or should have discovered sufficient facts to put her on actual or inquiry notice of her claim; and therefore, the original statute of limitations began to run anew, and Plaintiff was required to file her claim no later than June 2013. However, it appears Plaintiff's interest in this

> claim languished for another five years until she learned SSN
> had sold for $45 million dollars.

The court held that her claims against defendants, under the theories of fraud and breach of fiduciary duty, were barred by the statute of limitations in Tenn. Code Ann. § 28-3-105.

**B.**

Plaintiff argues that the statute of limitations was tolled until September 2014 when her son alerted her to the sale of SSN. That event sparked the pursuit of the present litigation. Plaintiff argues that, pursuant to the discovery rule, she had no actual or inquiry notice that she had been wronged until that point. She argues that this is because the defendants fraudulently concealed material information, withheld material information, and made affirmative representations to her regarding the legality of the purchase in order to hinder and ultimately prevent her discovery of the wrongful conduct. Plaintiff argues that summary judgment is inappropriate as the facts surrounding these issues remain disputed.

In general, the inquiry of when a plaintiff knew of or should have discovered a cause of action is a question of fact not properly decided on summary judgment. *See City State Bank v. Dean-Witter Reynolds, Inc.,* 948 S.W.2d 729, 735 (Tenn. App. 1996). If the facts, however, are not in dispute and clearly show that a cause of action has accrued and that the statute of limitations has run, a summary judgment may be entered.

"A defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines. All of these elements are inter-related and, therefore, should not be considered in isolation." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012). While the burden of proof is upon the party asserting the bar of the statute of limitations to show the bar, when that showing is made, the burden shifts to the other party to show an exception. *Id*.

The parties agree that the three year statute of limitations in Tenn. Code Ann. § 28-3-105 applies to these claims. We agree with the conclusion of the trial court that defendants have made out a *prima facie* case that the initial claims accrued when David the senior sold the businesses to himself in 1996. However, as noted above, plaintiff argues for the application of the discovery rule and the doctrine of fraudulent concealment to suspend or extend the running of the limitations period.

Under the discovery rule, the statute of limitations will only begin to run when the plaintiff has actual knowledge of the claim, or when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a

result of wrongful conduct. For the purposes of both the discovery rule and the doctrine of fraudulent concealment, whether a plaintiff exercised reasonable care and diligence in discovering her injury is usually a fact question for the trier of fact to determine. *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995).

The elements of fraudulent concealment, as set forth by the Supreme Court, are: (1) an affirmative act by the defendant to conceal the cause of action or the failure to disclose material facts despite a duty to speak; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) the defendant must be aware of the wrong; (4) the concealment of material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry. *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 465 (Tenn. 2012) (citations omitted).

"Plaintiffs asserting the doctrine of fraudulent concealment to toll the running of a statute of limitations must demonstrate that they exercised reasonable care and diligence in pursuing their claim. The statute of limitations is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id*. at 463. To come within the fraudulent concealment exception, plaintiff has the burden to prove that the defendants took affirmative action to conceal the cause of action from her. *See Vance v. Schulder*, 547 S.W.2d 927, 930 (Tenn. 1977). Plaintiff also has the burden to prove that she could not have discovered the cause of action despite exercising reasonable diligence. *Id*.

If it is established that the defendant fraudulently misrepresented or concealed a material fact, the statute of limitations is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of her claim. *Redwing*, 363 S.W.3d at 463. In general, the affirmative act to conceal material information must be more than mere silence. *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998). However, the "failure to speak where there is a duty to speak is the equivalent of some positive act or artifice planned to prevent inquiry or escape investigation." *Id*. (quoting *Hall v. De Saussure*, 41 Tenn. App. 572, 297 S.W.2d 81, 85 (1956)).

The defendants argue that plaintiff should have been suspicious in 2006 following a conversation with David the senior in which he informed her that the SSN stock would be transferred to a trust. The trial court's order stated that at this point plaintiff "began to have questions regarding the propriety of her father-in-law's purchase of her husband's business from the Estate." David the senior asserts that plaintiff was informed of the substantially increased value of the SSN stock during this conversation; plaintiff disputes this fact. Plaintiff maintains that no red flags were raised by this conversation, because, as

far as plaintiff knew at this point, David the senior was the proper owner of the stock. The trial court further held that, from 2009 to 2010, plaintiff requested and received multiple copies of the valuation. The court held that whatever "fraudulent concealment by David [the senior] which tolled the running of the statute of limitations, ended in 2010 due to the affirmative actions of David [the senior] in responding to each of Plaintiff's requests for information and by the conduct of Plaintiff."

The court proceeded under the erroneous assumption that plaintiff received all of the information she requested from defendants, including the valuation, and that she received accurate and complete copies of the same. However, plaintiff, as the non-moving party, set forth specific facts disputing that she received the requested documents from defendants. Those allegations, if taken as true, create genuine issues of material fact. Plaintiff argues that there

> remain numerous disputed issues of fact, such as what actual Mercer Capital report [plaintiff] received. There are no facts discussed in 2010 that would have alerted any reasonable person to the fraud that took place in 1996 – and even if there might have been, it remains a question of fact what a reasonable person should have understood and whether [plaintiff's] diligence was reasonable.

The parties' basic disagreements as to whether these valuations were received or even sent at all raise genuine issues of material fact that the trier of fact must resolve.

Additionally, as outlined above, there is material evidence sufficient to create a factual issue on whether David the senior fraudulently misrepresented or concealed material facts. Plaintiff has presented evidence indicating that the cause of action was known to and fraudulently concealed by David the senior. At or around the time of the sale of the SSN stock, David the senior was in a trusted and confidential relationship with plaintiff, and thus had a duty to disclose material information to her concerning the estate. Instead, as outlined above, plaintiff has adduced evidence that David the senior concealed and misrepresented numerous material facts surrounding his purchase of the companies. Furthermore, plaintiff has set forth specific facts showing that there remains a dispute as to whether, even during plaintiff's inquiry in 2010, David the senior remained silent as to necessary facts surrounding her inquiry and/or affirmatively misrepresented facts to her in his responses. Plaintiff argues that this is part of his ongoing scheme to defer questions, remain silent, prevent inquiry, and ultimately escape investigation. Accordingly, plaintiff asserts that he should be estopped from relying on the statute of limitations.

Under the circumstances, we cannot say as a matter of law, at this stage, that in the exercise of reasonable diligence, plaintiff should have discovered the defendant's

fraudulent concealment or sufficient facts to put her on actual or inquiry notice of her claim. Due consideration must be given to the evidence presented by plaintiff regarding defendants' silence and/or failure to disclose known facts over the years, and the affirmative representations made to plaintiff during her 2010 inquiry. In short, whether plaintiff exercised reasonable care and diligence in discovering the injury or wrong, what information the defendants actually provided plaintiff, what information was actively concealed or withheld from plaintiff, and what a reasonable person would or should know from the information actually provided, remain issues of fact for trial. Therefore, under the facts of this case, we hold that plaintiff has set forth sufficient material facts showing that there is a genuine issue for trial on her claims for fraud and breach of fiduciary duty.

## V.

Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, and (3) in defiance of the true owner's rights. ***Mammoth Cave Prod. Credit Ass'n. v. Oldham***, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). Actions for conversion of personal property shall be commenced within three-years of the accruing of the cause of action. Tenn. Code Ann. § 28–3–105; ***Sibley v. McCord***, 173 S.W.3d 416, 420 (Tenn. Ct. App. 2004). For the same reasons set forth above, summary judgment is improper as to plaintiff's claim for conversion.

## VI.

Plaintiff argues extensively that she has a separate claim against David the senior for extrinsic fraud under Tenn. R. Civ. P. 60.02. Rule 60.02 allows relief from a final order under limited circumstances. The general purpose of Rule 60.02 is "to alleviate the effect of an oppressive or onerous final judgment." ***Henderson v. SAIA, Inc.***, 318 S.W.3d 328, 335–36 (Tenn. 2010); ***Black v. Black***, 166 S.W.3d 699, 703 (Tenn. 2005). Rule 60.02 aims "to strike a proper balance between the competing principles of finality and justice." ***Jerkins v. McKinney***, 533 S.W.2d 275, 280 (Tenn. 1976).

Rule 60.02 provides that after an order is final, a court may relieve a party from a final judgment "[o]n motion and upon such terms as are just," based on the following grounds:

> (1) mistake, inadvertence, surprise or excusable neglect;
> (2) fraud..., misrepresentation, or other misconduct of an adverse party;
> (3) the judgment is void;
> (4) the judgment has been satisfied, released or discharged ... or
> (5) any other reason justifying relief from the operation of the judgment.

Tenn. R. Civ. P. 60.02. Motions made under Rule 60.02 must be filed within a "reasonable time." *Id.* A motion for relief under Rule 60.02 addresses itself to the sound discretion of the trial judge, and the scope of review is whether the trial judge abused that discretion. ***Underwood v. Zurich Ins. Co.,*** 854 S.W.2d 94, 97 (Tenn. 1993).

As the trial court properly noted, the only relief available to plaintiff under Rule 60.02 is the setting aside of the orders of the court closing the Estate of Steven Coffey and those by which David the senior purchased the stock of SSN. "[A] party may file an independent action to set aside a judgment only under unusual and exceptional circumstances and then only where no other remedy is available or adequate. ***Whitaker v. Whirlpool Corp.***, 32 S.W.3d 222, 229-30 (Tenn. Ct. App. 2000). After careful review, we hold that the trial court did not abuse its discretion in denying the relief requested by plaintiff under Rule 60.02. Additionally, as our holding above indicates, plaintiff has an alternative remedy available in the present action.

## VII.

In plaintiff's complaint for unjust enrichment against David the senior and David the younger, she states that a "benefit has been conferred upon and retained by Defendant David [the senior], when he accepted the $45,000,000 purchase price for the sale of the Companies' Stock in September 2014. A benefit was conferred upon and retained by the Trust upon acceptance of either the stock or the proceeds of the sale of the stock." (paragraph lettering omitted). The trial court granted summary judgment to defendants holding that plaintiff had not established that she conferred a benefit upon David the senior or the trust when the company was sold for $45,000,000 in 2015.

The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." ***Freeman Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512, 525 (Tenn. 2005); *citing* ***Paschall's, Inc.,*** 407 S.W.2d at 155. The Supreme Court has instructed that a benefit is any form of advantage that has a

> measurable value including the advantage of being saved from an expense or loss. The underlying principle of the doctrine of unjust enrichment is that a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit.
>
> In accordance with this underlying principle, we conclude that to recover for unjust enrichment, a plaintiff need not

establish that the defendant received a direct benefit from the plaintiff. Rather, a plaintiff may recover for unjust enrichment against a defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit would be unjust.

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citations omitted; emphasis supplied).

Defendants argue that plaintiff did not confer a benefit, because she did not transfer the SSN stock to Trustee, the GRAT, or the Descendants Trust. David the senior transferred the SSN stock to the GRAT, and then the GRAT transferred the SSN stock to the Descendants Trust and four SSN employees. David the senior transferred the Renaissance stock to the Descendants Trust. Ladenburg Thalmann then purchased the companies from the Descendants Trust and the employees, and paid the purchase price to the Descendants Trust. Plaintiff agrees that she did not herself transfer $45,000,000 to either defendant or the trust. Plaintiff argues that, as the residuary beneficiary of the estate and the family trust, she initially transferred the benefit that twenty years later resulted in the $45,000,000 sale.

We find that it is too attenuated to say that plaintiff conferred even an indirect benefit on defendants that culminated in Ladenburg Thalmann's 2015 purchase of SSN for $45,000,000. We affirm the trial court's granting of summary judgment on this claim. Accordingly, we decline to impose the constructive trust requested by plaintiff.

## VIII.

Defendant David the younger filed a Rule 11 motion against plaintiff personally and against her attorneys after his second motion for summary judgment was decided by the court in his favor. After a hearing, the trial court granted plaintiff $10,000 in attorney's fees. Rule 11.03(1)(a) states that, "[i]f warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." After a careful review of the record, we disagree with David the younger's contention that the court awarded plaintiff attorney's fees solely because she was the prevailing party. We hold that the trial court did not abuse its discretion in determining that the award of attorney's fees to plaintiff was warranted, based on the circumstances.

## IX.

In conclusion, and speaking in general terms with respect to the plaintiff's suit, there are genuine issues of material fact in this case that preclude a grant of summary judgment at this time. Did the defendants, individually or in concert with one another,

defraud the plaintiff by making false statements, abusing positions of trust, withholding material information, or by furnishing incomplete and inaccurate information? If so, when did the plaintiff know, or should have known, that the defendants were guilty of fraudulent concealment? Was her suit filed within the period of the applicable statute of limitations? If a trier of fact believes the evidence proffered by the plaintiff, including favorable implications from that material, he, she, or it could reasonably conclude that the defendants are liable to the plaintiff. Having said all of this, we express no opinion as to the merits of the plaintiff's suit.

## X.

The judgment of the trial court is affirmed in part and reversed in part. This case is remanded to the trial court for further proceedings. Costs on appeal are assessed to appellees, David L. Coffey and David Michael Coffey as trustee.

_____
CHARLES D. SUSANO, JR., JUDGE